UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SCANNED

ROBERTSON STEPHENS, INC. and BANK OF AMERICA CORPORATION, as the successor to FLEETBOSTON FINANCIAL CORPORATION

Plaintiffs,

v.

FEDERAL INSURANCE CO. and BULFINCH INDEMNITY COMPANY, LTD., as the successor to FFG INSURANCE CO., LTD.,

Defendants.

Case No. 05-360-S-LDA

**DEFENDANT FEDERAL INSURANCE COMPANY'S MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Federal Insurance Company ("Federal") submits this motion to dismiss the Complaint filed against it by plaintiffs Robertson Stephens, Inc. and Bank of America Corporation for bad faith claims handling, negligence, and intentional interference with the contract. As set forth in more detail in the accompanying memorandum of law, which is incorporated by reference herein, the Complaint fails to state a claim against Federal upon which relief can be granted. Accordingly, Federal respectfully requests that its motion to dismiss be granted.

Dated: December 14, 2005

Respectfully submitted,

Stephen J. Reid, Jr., Bar Id. No. 2811
BLISH & CAVANAGH, LLP
30 Exchange Terrace
Providence, R.I. 02903
Tel: (401) 831-8900
Fax: (401) 751-7542

Of Counsel:

Jonathan A. Constine
Douglas S. Crosno
HOGAN & HARTSON L.L.P.
555 13th Street, N.W., Suite 800E
Washington, D.C. 20004
Tel: (202) 637-5870
Fax: (202) 637-5910

Attorneys for Defendant
Federal Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was forwarded this date to all counsel of record.

Stephen J. Reid, Jr.

Dated: December 16, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERTSON STEPHENS, INC. and BANK OF AMERICA CORPORATION, as the successor to FLEETBOSTON FINANCIAL CORPORATION

Plaintiffs,

v.

Case No. 05-360-S-LDA

FEDERAL INSURANCE CO. and BULFINCH INDEMNITY COMPANY, LTD., as the successor to FFG INSURANCE CO., LTD.,

Defendants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT FEDERAL INSURANCE COMPANY'S MOTION TO DISMISS**

Defendant Federal Insurance Company submits this memorandum in support of its motion to dismiss the complaint against it filed by plaintiffs Robertson Stephens, Inc. ("RSI") and Bank of America Corporation for bad faith claims handling, negligence, and intentional interference with the contract.

**ALLEGATIONS OF THE COMPLAINT**

Plaintiff Bank of America Corporation ("Bank of America") is a Delaware corporation with its principal place of business in North Carolina. Bank of America is the successor-in-interest to FleetBoston Financial Corporation ("Fleet") by virtue of a merger whereby Fleet was merged into Bank of America. Complaint ¶ 1. At all times relevant to this insurance action, Fleet, a bank holding company, was a Rhode Island corporation with its principal place of business in Rhode Island. Id. ¶ 2.

Plaintiff Robertson Stephens, Inc. is a Massachusetts corporation that operated as an investment bank and securities firm with its principal place of business in San Francisco,

California. Id. ¶ 3. At all relevant times, Fleet's wholly owned subsidiary Robertson Stephens Group, Inc. ("RSGI") was the holding company for RSI. Id. ¶ 3.

Defendant Federal Insurance Company ("Federal") is now and was at all relevant times an Indiana corporation with its principal place of business at 15 Mountain View Road, Warren, New Jersey. Id. ¶ 6. 1/ Defendant Bulfinch Indemnity Company, Ltd. ("Bulfinch") is the successor-in-interest to FFG Insurance Co. Ltd. ("FFG"). Id. ¶ 7.

## I. THE POLICY

Fleet and FFG were parties to a primary insurance policy styled as a "Combined Risk Protection Program," bearing Policy Number FFG 0004 (the "Policy"), whereby FFG agreed to insure Fleet and its subsidiaries, including RSI, against certain losses that might be incurred by the Fleet parent organization or by its subsidiaries. Id. ¶ 9. The Policy included coverage under a section entitled "Employment Practices Liability" ("EPL"). Id. ¶ 11.

The Policy applied to claims first made against Fleet and/or RSI during a Policy Period of October 1, 1999 to January 1, 2003, which was later extended to January 1, 2004. Id. ¶ 12 and Exhibit A, Items 3 and 5. Subject to certain terms, conditions, limitations and exclusions, the EPL provisions provided coverage for "**Loss**" on account of "**Claims,**" which were defined as (among other things) written demands for monetary or non-monetary relief brought by past, present or prospective employees of Fleet or its subsidiaries in connection with any actual or alleged wrongful termination of employment, or breach of any oral or written employment contract or quasi-employment contract. Id. ¶ 13 and Exhibit C, ¶¶1 & 13(i)(b).

The Policy had an aggregate Limit of Liability of $100,000,000. Id., Exhibit A, Item 6. However, the Policy also provided that "no coverage shall attach from this policy until [Fleet] has

---

1/ The Complaint also alleges claims against Chubb & Son Inc. and The Chubb Corporation, who, along with Federal, are referred to collectively as "Chubb." The parties have reached an agreement under which it is anticipated that Chubb & Son Inc. and The Chubb Corporation will be dismissed as parties to this suit. Accordingly, references to "Chubb" in the Complaint will be treated herein as references to "Federal."

incurred a **Retention** amount per loss or claim" of $10,000,000. Id., Exhibit A, Item 7 (emphasis added).

## II. THE CLAIM ADMINISTRATION AGREEMENT

As of October 1, 1999, FFG and a division of Federal, Chubb & Son, entered into a "Claim Administration Agreement." Id. ¶ 18 and Exhibit D. 2/ The Claim Administration Agreement provided that FFG granted to Federal "the authority to receive, review and evaluate any **Claims** under the **Policy**" and "the authority to deny, negotiate, adjust or settle any claims made under [the] **Policy** only with the express written permission of [FFG] . . . ." Id. The Claim Administration Agreement also provided that Federal had "full authority to interpret policy language, make coverage decisions, and to settle covered Claims for any amount up to the Policy limits," and that "[a]ll decisions with respect to the ultimate disposition of a Claim under the Policy's limits shall be made by [Federal]." Id. ¶ 19 and Exhibit D, § 2(C), (D). Federal agreed that it "will comply with all applicable laws and regulations, including but not limited to those relating to claim settlement practices." Id. ¶ 22 and Exhibit D, § 3. At all relevant times Federal acted as the agent of FFG in handling and otherwise administering the claims brought by Fleet under the Policy. Id. ¶ 25.

Federal is also one of the reinsurers of coverage under that Policy, providing a quota share of 30% of the $100,000,000 reinsurance limit of liability. Id. ¶ 24.

## III. THE RSI EMPLOYMENT CLAIMS

On July 12, 2002, RSI announced that it would cease its broker-dealer operations and RSI began the process of closing out its positions and winding down its business operations. Id. ¶ 27.

---

2/ As an unincorporated division of Federal, Chubb & Son has no separate existence from, and is legally indistinguishable from, Federal. E.g., In re Sugar Industry Antitrust Litigation, 579 F.2d 13, 18 (3rd Cir. 1978) ("A division of a corporation is not a separate entity but is the corporation itself."). Accordingly, references to "Chubb & Son" in the Claim Administration Agreement will be treated as referring to Federal.

Most of RSI's employees were let go in July 2002, but some employees remained for a longer period to assist in the orderly wind-down of the operations. Id.

As part of the wind-down process, RSI offered certain incentives to its employees in exchange for a release. Id. ¶ 28. Based upon the refusal of certain employees to execute such a release and based on oral conversations with those employees, RSI and Fleet had reason to believe that some or all of those employees were planning to institute legal proceedings against RSI and/or Fleet on account of the termination of their employment with RSI. Id.

On or about December 16, 2002, in accordance with the General Conditions of the Policy, Fleet provided notice to FFG, through Federal, of facts and circumstances giving rise to potential claims against RSI and Fleet that were anticipated to be asserted by certain former high ranking executives of RSI (the "Executives") as a result of their prior employment with RSI and the wind-down of RSI's operations. Id. ¶ 29. On or about February 26, 2003, Fleet additionally provided to Federal a written "Notice of Threatened Robertson Stephens Employment Actions," again putting Federal and FFG on notice of the Executives' employment claims. Id. ¶ 30.

On or about March 31, 2003, Federal, on behalf of FFG, responded to Fleet's written notice, denying coverage under the Policy on the basis that Fleet had not presented an actual "claim" as defined under the Policy because the Executives had not yet made a written demand for relief. Id. ¶ 31.

On or about June 4, 2003, the Executives served on Fleet such a written demand, enclosing a draft of a civil action complaint against Fleet and RSI seeking damages, indemnity, and statutory penalties arising from RSI's and Fleet's alleged breach of the Executives' oral, written and implied employment agreements. Id. ¶ 32. The Executives also served draft demands for arbitration of the same claims. Id.

On or about June 20, 2003, Fleet tendered to FFG, through Federal, a copy of the Executives' June 4, 2003 demand letter, draft civil complaint and draft arbitration claim and Fleet, for itself and RSI, sought defense and indemnification from FFG under the Policy. Id. ¶ 33.

Neither Federal nor FFG responded to the June 20, 2003 tender of the Executives' employment claims until February 2004. Id. ¶ 34.

In September 2003, the Plaintiffs informed FFG through Chubb that they had commenced discussions and negotiations with counsel for the Executives with the intent to settle the dispute. Id. ¶ 37. In or about December 2003, the Plaintiffs gave Chubb formal notice of the likelihood of a settlement which was to be in excess of $5,000,000. Id. ¶ 42.

While the Plaintiffs were negotiating with the Executives in December 2003 and early January 2004, Federal informed Fleet orally that the tendered claims were not covered at all under the extended reporting period, mistakenly relying on a scrivener's error in the language of the Policy. Id. ¶ 43. On or about January 9, 2004, RSI and Fleet informed FFG, through Federal, that Fleet and RSI had concluded a settlement of the Executives' employment claims within the $100,000,000 aggregate limit of liability under the Policy. Id. ¶ 44.

On February 25, 2004, Federal responded in writing to Fleet's June 20, 2003 tender of the Executives' claims for defense and indemnification. Id. ¶ 45. Federal acknowledged that the Executives' claims were covered: "After reviewing the provisions of the [EPL] coverage section of [the Policy] . . . [Federal] has determined that the Policy affords coverage for this Claim. . . ." (Emphasis added). Id. Federal also acknowledged that the Policy reporting period for claims had been extended to January 1, 2004, such that the June 20, 2003 tender of claims indisputably fell within the claims-made policy period. Id. While acknowledging that the Policy affords coverage for this claim, Federal also asserted that it would further investigate the claim and any defenses FFG might have to coverage. Id.

According to the Complaint, Federal and FFG have not reimbursed Fleet and RSI for any of the defense costs incurred in defending, investigating and ultimately settling the Executives' claims or for the settlement payment required under the terms of the Policy. Id. ¶ 49. Accordingly, Fleet and RSI's Complaint in this action asserts six counts for relief. Three counts – for declaratory judgment, breach of contract and breach of the implied covenant of good faith and fair dealing – are against FFG's successor, Bulfinch, alone. One count – for bad faith claims handling

– is asserted against both Bullfinch and Federal. Finally, two counts – for tortious interference with contractual relations and negligence – are asserted against Federal alone.

**ARGUMENT**

The claims against Federal (all of which sound in tort) are based upon its conduct in adjusting the insurance claims brought under the Policy. The question before the Court on this motion, therefore, is whether Federal can be liable in tort to parties with whom Federal had no contractual or other legal relationship, who are suing as insureds under a Policy issued by another entity, based on Federal's adjustment of claims as agent for the insurer who issued the Policy.

The answer to that question is clearly "no." Under California law, which governs the claims of at least one of the plaintiffs in this action, and under the law of the vast majority of jurisdictions that have addressed the issue, a company hired by an insurer to adjust claims on its behalf cannot be liable (in tort or in contract) to the insureds making the claim. While the insurer may be liable for the adjuster's acts, the insureds have no direct claim against the adjuster, who was acting as the insurer's agent.

That widely-accepted principle is dispositive of Bank of America's and RSI's claims against Federal here. Plaintiffs' tort claims against Federal fail on their face, because they seek to hold Federal liable for its conduct in adjusting claims under an insurance policy issued by FFG. Plaintiffs' sole remedy is against Bulfinch, FFG's corporate successor, whom plaintiffs have also named as a defendant in this suit. Accordingly, the claims against Federal should be dismissed.

## I. UNDER THE APPLICABLE LAW, FEDERAL CANNOT BE LIABLE TO FFG'S INSUREDS FOR ITS CONDUCT IN ADJUSTING THEIR INSURANCE CLAIM

The initial question in determining the legal sufficiency of the claims against Federal is what law applies. Under Rhode Island choice-of-law principles (which govern here), 3/ the law applicable to a tort claim is determined by "which jurisdiction 'bears the most significant relationship to the event and the parties,'" which is in turn a factor of "the place(s) of injury and tortious conduct; the domicile and residence of the parties, and where they do business; the place where the parties' relationship was centered; and considerations of sound judicial policy." Fashion House, 892 F.2d at 1092. Of these, "the most important factor is the location where the injury occurred." Taylor v. Mass. Flora Realty, Inc., 840 A.2d 1126, 1128 (R.I. 2004).

In this case, the alleged "injury" to RSI and/or Fleet resulting from Federal's alleged conduct occurred either in California, where RSI is located, or Rhode Island, where Fleet is located. However, the Court need not determine whether California or Rhode Island law applies on this motion to dismiss, because the outcome would be same in either case. "When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter." Fashion House, 892 F.2d at 1092; see also Fratus v. Republic Western Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998) ("A federal court sitting in diversity need not make a finding regarding which state's law is to be applied where the case's resolution would be identical under either state's law."). Neither Rhode Island nor California has recognized a tort cause of action by an insured against a claims adjuster, and California has affirmatively held that no such cause of action exists, whether denominated as "bad faith," "negligence," or "interference with contract."

---

3/ Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989) ("In a tort case invoking diversity jurisdiction, a federal district court must apply the forum's choice-of-law principles.").

### A. Under California Law, a Tort Cause of Action Cannot be Asserted Against an Adjuster

California courts have considered whether the causes of action advanced against Federal in this case – bad faith, negligence and interference with contract – can be stated against an adjuster hired by an insurer to adjust claims. Those courts have squarely held that no such cause of action exists.

The seminal case on this issue in California is Henry v. Associated Indemnity Corp., 266 Cal. Rptr. 578 (Cal. App. 1990). In Henry, the insured made the same argument advanced in the pleadings here: "At all times relevant hereto there was a contract between UNDERWRITERS [the adjuster] and MAYFLOWER [the insurer] pursuant to which UNDERWRITERS would carry out MAYFLOWER'S legal duties whenever MAYFLOWER'S insureds presented claims under policies issued by MAYFLOWER. At all times relevant hereto, Plaintiffs were the intended third-party beneficiaries of said contract." Id. at 584-85. On a demurrer, the court set about "to determine if Underwriters, an adjuster, is properly subject to potential liability" to the insureds on a claim of bad faith. Id. at 585.

The court concluded that no such potential liability existed:

> With respect to Henry's third-party beneficiary contractual theory, we note merely that there is no authority for such a cause of action, and that the Mayflower-Underwriters claims adjustment contract can in no sense to be said to have been made for the express benefit of a third-person policy holder, such as Henry, as would be required under [the third-party liability statute]. That contract contemplated that adjusting services would be provided for the respective benefit of the insurer and the insured, depending on the facts of the individual claim; it did not contemplate Henry's claim would be successful or impose any new duties to Henry other than those which inhere in the actual contract of insurance. Therefore, the trial court correctly concluded the sixth cause of action [for breach of contract] was not stated against Underwriters.

Id. at 585 (emphasis added). The court also rejected the notion that the adjuster could be subject to a claim for bad faith based on alleged violations of California's claims practices statute, noting that "[w]e consider Underwriters' relationship to Mayflower, as pled, to be akin to an agency or



\\\DC - 57212/0574 - 2230150 v1

employee relationship, and do not believe a separate right of action [for bad faith] against Underwriters now exists or ever did." Id.

The views expressed in Henry have been adopted by other California appellate divisions. See Thompson v. Cannon, 274 Cal. Rptr. 608, 610 (Cal. App. 1990); Stone v. New England Ins. Co., 39 Cal. Rptr. 2d 714, 730-31 (Cal. App. 1995) (unpublished); see also Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1038-39 (Cal. 1973) (dismissing claims for bad faith against adjusters).

California courts have similarly rejected that notion that an adjuster can be liable under a theory of negligence. In Sanchez v. Lindsey Morden Claims Services, Inc., 84 Cal. Rptr. 2d 799 (Cal. App. 1999), the California Court of Appeal considered whether a negligence claim could be asserted against an adjuster for undue delay in the payment of a claim. The Court of Appeal rejected that notion. The court reasoned that while "the insurer-retained adjuster is subject to the control of its clients, and must make discretionary judgment calls," it is "the insurer, not the adjuster, [who] has the ultimate power to grant or deny coverage." Id. at 801-02. The court also noted that permitting a negligence claim would offend public policy, because "the insurer's potential liability is circumscribed by the policy limits, and the other conditions, limits and exclusions of the policy, [while] the adjuster has no contract with the insured and would face liability without the chance to limit its exposure by contract." Id. at 802. Finally, the court explained:

> Imposing a duty [of care] also would subject the adjuster to conflicting loyalties. Insurers and insureds often disagree as to coverage or the amount of loss. An adjuster cannot argue both sides of such disputes, any more than a lawyer can represent opposite sides in a lawsuit. An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy.



\\\DC - 57212/0574 - 2230150 v1

Id. (emphasis added); see also Cobarrubias v. Allstate Ins. Co., 1998 WL 656571, *1 (C.D. Cal. July 10, 1998) ("[A]n insurance adjuster does not owe a duty of care to the insured. Therefore, an adjuster cannot be sued for negligence.").

It is equally clear that a claim for tortious interference with contract cannot be asserted against an adjuster for acts allegedly committed in the course of adjusting claims. It is well-settled that a claim for tortious interference with contract requires a type of "conspiracy" between the contracting party and a stranger to the contract. See Manor Investment Co v. F.W. Woolworth Co., 206 Cal. Rptr. 37, 43 (Cal. App. 1984). As the California Supreme Court has explained, "[i]t is . . . well established that corporate agents . . . acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract." Shoemaker v. Myers, 801 P.2d 1054, 1068 (Cal. 1990).

On that basis, the California Supreme Court held in Gruenberg that adjusters, as agents of the insurer, cannot be held liable on a theory of conspiracy, including a conspiracy to deprive insureds of benefits under their insurance policy. 510 P.2d at 1039. In so holding, the court noted that "[t]his rule . . . 'derives from the principle that ordinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract . . . .'" Id.

The Complaint in this case alleges that "[a]t all relevant times Chubb [i.e., Federal] acted as the agent of FFG in handling and otherwise administering the claims brought by Fleet under the Insurance Policy." Complaint ¶ 25. Consistent with the case law cited above, and applying general principles pertaining to the tortious interference cause of action, it is clear that a claim for tortious interference against Federal cannot withstand judicial scrutiny. Like the claims for bad faith and negligence, it fails as a matter of law.

**B. Even if Rhode Island Law Applied, Plaintiffs' Causes of Action Against Federal Would Fail as a Matter of Law**

It is clear that to the extent California law applies, plaintiffs' claims against Federal fail as a matter of law. Even if the Court were to conclude that Rhode Island law were more likely to apply, the result would be the same. While Rhode Island courts have not specifically addressed whether tort claims may be asserted against an adjuster, the vast majority of courts that have considered that issue have rejected such claims. There is no reason why Rhode Island would not follow the majority rule and hold such claims to be legally insufficient.

Where the courts of the forum state have not addressed an issue, a federal court must make a "fair prediction as to the course the highest state court would take were it presented with the same legal issue." Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 71 (1st Cir. 2003). In "making an informed prophecy of what the [state] court would do in the same situation," the federal court is guided by "analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." Blinzler v. Marriott Intern., Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). Those factors (except "learned treatises," which, to our knowledge, do not address these issues) strongly support the conclusion that Rhode Island courts would not permit tort claims against an adjuster in these circumstances.

**1. The Majority Rule Supports Dismissal of the Claims Against Federal**

The factor of "persuasive adjudications by courts of sister states" weighs heavily in favor of dismissal. Federal courts (in this circuit and elsewhere) seeking to predict state law have routinely placed great emphasis on the rule followed by the majority of courts. See, e.g., Almonte v. National Union Fire Ins. Co., 705 F.2d 566, 569 (1st Cir. 1986) ("Apparently, the Rhode Island courts have not specifically addressed this question. . . . However, the trial judge apparently followed the majority rule . . . . We would be unwilling to hold that Rhode Island law is contrary to the majority rule."); Oman Intern. Finance Ltd. v. Hoiyong Gems Corp., 616 F.Supp. 351, 358 n.5 (D.R.I. 1985) (holding that Rhode Island court would apply the majority rule, noting that

"sister state adjudications are an important resource for the federal district courts in vaticinating the law of the forum state"); see also In re Millette, 186 F.3d 638, 641 (5th Cir. 1999); Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp., 186 F.3d 815, 820 (7th Cir. 1999).

The views adopted in the California decisions cited above also represent the majority view in other jurisdictions. In Charleston Dry Cleaners & Laundry, Inc. v. Zurich American Ins. Co., 586 S.E.2d 586 (S.C. 2003), the South Carolina Supreme Court rejected the notion that a bad faith claim could be brought against an adjuster. Id. at 588. The court went on to consider whether a negligence claim could be brought, and observed: "There is a split of authority among those state jurisdictions that have addressed whether a negligence claim can be brought against an independent adjuster. The majority does not allow this cause of action." Id. (emphasis added). The court then added its own jurisdiction to that majority, stating: "We decline to recognize a general duty of due care from an independent insurance adjuster or insurance adjusting company to the insured, and thereby align South Carolina with the majority rule on this issue." Id. at 588-89.

Those jurisdictions adopting the "majority rule" declining to permit a tort claim against an adjuster include Arizona, California, Florida, Indiana, Kansas, Kentucky, Louisiana, New York, South Carolina and Texas. See Meineke v. GAB Business Servs., Inc., 991 P.2d 267 (Ariz. Ct. App. 1999); Sanchez v. Lindsey Morden Claims Servs., Inc., 84 Cal. Rptr. 2d 799 (Cal. App. 1999); King v. National Security Fire and Cas. Co., 656 So.2d 1338 (Fla. Dist. Ct. App.1995); Troxell v. American States Ins. Co., 596 N.E.2d 921, 925 n. 1 (Ind.Ct.App.1992); Wolverton v. Bullock, 35 F.Supp.2d 1278 (D. Kan.1998); Malone v. Cook, 2005 WL 2758091 (W.D. Ky. Oct. 25, 2005); M & M Towing Co., Inc. v. United Capitol Ins. Co., 1998 WL 169694 (E.D. La. 1998); Velastequi v. Exchange Ins. Co., 505 N.Y.S.2d 779 (N.Y.City Civ.Ct.1986); Dear v. Scottsdale Ins. Co., 947 S.W.2d 908 (Tex. App. 1997). 4/

---

4/ The four jurisdictions in the minority are Alaska, Mississippi, New Hampshire, and Oklahoma. See Continental Ins. Co. v. Bayless and Roberts, Inc., 608 P.2d 281 (Alaska 1980);

[Footnote continued]

Simply put, there is no reason to believe that Rhode Island courts would reject the reasoning of the majority view in favor of a minority approach that permits an insured to sue an adjuster with whom it has no contractual relationship. In fact, as shown below, Rhode Island case law is consonant with the law in those other jurisdictions that have rejected tort claims against adjusters.

**2. Analogous Case Law in Rhode Island Supports Dismissal of the Claims Against Federal**

In Rhode Island, a "bad faith" cause of action is dependent upon the existence of a contractual relationship. See Bartlett v. John Hancock Mutual Life Insurance Co., 538 A.2d 997, 1000 (R.I. 1988) ("[T]here can be no cause of action for an insurer's bad faith refusal to pay a claim until the insured first establishes that the insurer breached its duty under the contract of insurance."). More significantly, the specific statute under which Bank of America and RSI bring their claims – R.I. Gen. Laws § 9-1-33 – specifically limits the claims available under that statute to actions by "an insured under any insurance policy . . . against the insurer issuing said policy." Id. (emphasis added). Thus, by its very terms, the Rhode Island "bad faith" statute would not permit a claim against Federal, which is not Bank of America or RSI's "insurer" and indisputably did not "issu[e]" the Policy.

Rhode Island courts have applied the language of the bad faith statute as written. In LeFranc v. Amica Mut. Ins. Co., 594 A.2d 382 (R.I. 1991), the Rhode Island Supreme Court rejected a claim against an insurer's claims manager, holding that "the defendants are correct in interpreting this statute to apply only to insurance companies and not to individual employees." Id. at 384. Similarly, there is no reason why Rhode Island courts would apply that statute to an

---

[Footnote continued]

Bass v. California Life Ins. Co., 581 So.2d 1087 (Miss.1991); Morvay v. Hanover Ins. Cos., 506 A.2d 333 (N.H. 1986); Brown v. State Farm Fire and Cas. Co., 58 P.3d 217 (Okla. Civ. App. 2002).

adjuster who is clearly not the "insurer" and did not "issu[e] said policy," in direct contravention of the statutory language.

Similarly, Rhode Island Supreme Court authority supports the proposition that an insurance company's agent cannot be held liable for acts committed in that capacity. In Cardente v. Maggiacomo Ins. Agency, Inc., 272 A.2d 155 (R.I. 1971), the Rhode Island Supreme Court held that an insurance agent who failed to make requested changes to an insured's policy was not personally liable because it was an agent acting on behalf of a disclosed principal. In reaching that conclusion, the court explained:

> It has long been settled that an agent acting on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of his authority. This principle applies to dealings between insurance agents and insureds. It is for this reason that an insurance agent who fails to make policy changes requested by an insured is not responsible to the insured for that failure if when he agreed to procure the change he was acting for a disclosed carrier and had authority to do what he agreed to do. While the rule may appear to be harsh, the third party is not remediless for in law the disclosed principal is just as much bound as if the agent had fully performed his agreements.

Id. at 156 (emphasis added; citations omitted).

That reasoning applies squarely here. The Complaint alleges unequivocally that Federal acted as FFG's agent "[a]t all relevant times." Complaint ¶ 25. Indeed, the Complaint alleges that Federal was granted "full authority to interpret policy language, make coverage decisions, and to settle covered Claims. . . ." Id. ¶ 19. Moreover, FFG was clearly "disclosed" as Federal's principal; Bank of America and RSI acknowledge that notice to FFG was provided "through" Federal. Id. ¶ 29.

Thus, the Complaint expressly alleges that Federal was a "an agent acting on behalf of a disclosed principal . . . within the scope of his authority." Cardente, 272 A.2d at 156. Thus, under Rhode Island law, Federal cannot be liable to FFG's insureds for its conduct in adjusting claims for FFG. Rather, FFG (or its successor, Bulfinch) is "bound" by Federal's actions, leaving Bank of America and RSI with a remedy against Bulfinch.

In sum, the factor of "analogous state court decisions" also supports the conclusion that Rhode Island would adopt the majority view that an adjuster is not liable to an insured in tort.

**3. Policy Considerations Favor Rejection of the Tort Theories Advanced by Plaintiffs**

The final factor in making an "Erie prediction" – public policy considerations – also favor adoption of the majority view. Those considerations have been discussed at length in the California cases, and are quoted at length above. In short, permitting an adjuster to be held directly liable in tort to an insured would circumvent the contractual arrangement between the insured and insurer by permitting an insured to recover directly from a stranger to the insurance contract, without the limitations negotiated for and on which the premium was based. It would also create conflicting loyalties on the part of the adjuster, who is hired as the insurer's agent to perform tasks on the insurer's behalf.

Adopting those tort causes of action in the face of a contrary majority rule, and in the absence of any on-point case law in Rhode Island, would be particularly inappropriate in light of the federal forum in which this case has been brought. Courts in this District and in the First Circuit have consistently expressed the view that federal courts should be reticent to adopt new or novel theories of liability under state law:

> In diversity jurisdiction, "[o]ur function is not to formulate a tenet which we, as free agents, might think wise, but to ascertain, as best we can, the rule that the state's highest tribunal would likely follow." If we are unwilling to stretch state precedents to reach new frontiers, a litigant . . . who deliberately "chose to reject a state-court forum in favor of a federal forum ... is in a perilously poor position to grumble" about our stodginess. . . . We may, perhaps, be unadventurous in our interpretation of [state] law, but a plaintiff who seeks out a federal venue in a diversity action should anticipate no more.

Porter v. Nutter, 913 F.2d 37, 40-41 (1st Cir. 1990) (citations omitted). Here, Bank of America and RSI, having chosen a federal forum, should not be heard to complain that this Court should adopt tort causes of action against an adjuster that have not been adopted in Rhode Island, are contrary to the majority rule, and impose liability inconsistent with Rhode Island principles of

insurance and agency law. Rather, those causes of action should be rejected, and the claims against Federal dismissed.

## CONCLUSION

For all of the foregoing reasons, defendant Federal Insurance Company respectfully requests that the motion to dismiss be granted.

Dated: December 14, 2005

Respectfully submitted,

Stephen J. Reid, Jr., Bar Id. No. 2811
BLISH & CAVANAGH, LLP
30 Exchange Terrace
Providence, R.I. 02903
Tel: (401) 831-8900
Fax: (401) 751-7542

Of Counsel:

Jonathan A. Constine
Douglas S. Crosno
HOGAN & HARTSON L.L.P.
555 13th Street, N.W., Suite 800E
Washington, D.C. 20004
Tel: (202) 637-5870
Fax: (202) 637-5910

Attorneys for Defendant
Federal Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was forwarded this date to all counsel of record.

Stephen J. Reid, Jr.

Dated: December 16, 2005