UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERTSON STEPHENS, INC. and BANK OF AMERICA CORP., as successor to FLEETBOSTON FINANCIAL CORP.,

Plaintiffs,

v.

CHUBB CORP., FEDERAL INSURANCE CO., CHUBB & SON, INC., and BULLFINCH INDEMNITY COMPANY, LTD., as successor to FFG INSURANCE CO., LTD.,

Defendants.

C.A. No. 05-360 S

OPINION AND ORDER

William E. Smith, United States District Judge.

This diversity action raises several novel and interesting insurance law issues. It arises from an insured's allegation that its insurer both failed to defend it from claims of breach and to indemnify it for a settlement within the policy's aggregate limit. The insured also has sued the insurer's claims administrator. The relationships of the parties gives the case the interesting twist: the insurer is a captive of the insured and the claims administrator is also one of the reinsurers under the policy. The claims administrator has moved to dismiss all counts against it (Counts IV through VI). The questions before the Court are whether

an independent claims administrator can be liable to an insured for bad faith claims handling (Count IV), tortious interference with contractual relations (Count V), or negligence (Count VI). For the reasons set forth below, the Court finds that the insured can maintain the bad faith and tortious interference claims, but not the negligence claim.

I. BACKGROUND

Under the familiar Fed. R. Civ. P. 12(b)(6) rubric, the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor. Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 62 (1st Cir. 2004). In deciding the motion, the Court may also consider documents (such as the contracts discussed below) integral to or explicitly relied upon in the complaint, whether or not those documents are attached to the complaint. Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005); Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). The Court recites only those facts necessary to decide the present motion, beginning with a brief introduction of the parties.

Robertson Stephens, Inc. ("RSI") is an investment and securities firm that is wholly owned by Robertson Stephens Groups, Inc. ("RSGI"), a holding company. Bank of America Corporation is successor-in-interest to FleetBoston Financial Corporation (collectively, "Fleet" or "Plaintiffs"), and wholly owns RSGI. FFG

Insurance Co., Ltd. ("FFG") was,[1] at all times relevant to this case, a captive insurance company ("captive") of Fleet.[2] Federal Insurance Company ("Federal" or "Defendant") is FFG's claims administrator and, by a separate agreement, one of the reinsurers of coverage.[3]

Three documents define the relationships among the parties to this dispute. The first is the "Combined Risk Protection Program" (the "Policy"), which is a primary insurance policy FFG issued to its owner, Fleet. The Policy provides coverage to Fleet and its subsidiaries, including RSI, against certain losses. For example, § 6, entitled "Employment Practices Liability," requires FFG to "pay on behalf of the Insureds all Loss for which the Insured becomes legally obligated to pay on account of any Claim first made

---

[1] Bullfinch Indemnity Company, Inc. is a named defendant and successor-in-interest to FFG, but is not implicated directly in this motion. For ease of reference, the Court shall refer to FFG exclusively.

[2] A captive is a wholly-owned subsidiary that insures some or all of the risks of its parent, and, generally, is not otherwise involved in the insurance business. Parents create and insure through captives often to avail themselves of a tax deduction for the amount of premiums paid, which they would not be able to deduct if they simply self-insured, for example. <u>See generally</u> 3 <u>Couch on Insurance</u> § 39:2 (Lee R. Russ ed., 3d ed. 2006).

[3] The complaint also named as defendants The Chubb Corporation ("Chubb") and Chubb & Son, Inc. ("Chubb & Son"). However, based on the representation that neither Chubb (Federal's parent) nor Chubb & Son (an unincorporated division of Federal) is party to the agreements at issue in this case, the parties entered into a tolling agreement, in December 2005, dismissing without prejudice all claims against them.

against the Insured during the Policy Period," (Policy § 6-1), and to "defend against any Claim covered by this Policy." (Id. § 6-6.) Coverage, however, was subject to a lengthy list of exclusions, (id. § 6-3), and required that "the Insureds shall, as a condition precedent to exercising their rights under this Policy, give to the Company written notice of any Claim made against any of them for a Wrongful Act after any Insured determines it is reasonably possible that Loss on account of such Claim will meet or exceed $5,000,000." (Id. § 6-7.) The Policy maintains a $100 million aggregate limit, with a $10 million per-loss/claim retention amount.

The second is the "Claims Administration Agreement" ("Administration Agreement") between FFG and Federal. The Administration Agreement delegates to Federal the authority "to receive, review and evaluate any Claims" brought under the Policy, (Administration Agreement § 2(A)), and "to interpret [Policy] language, make [Policy] coverage decisions, and to settle covered Claims for any amount up to the [Policy] limits." (Id. § 2(C).) Although Federal's authority "to deny, negotiate, adjust or settle" claims was contingent on FFG's express written permission, (id. § 2(A)), seemingly conflicting language indicates that "[a]ll decisions with respect to the ultimate disposition of a Claim . . . shall be made by [Federal]." (Id. § 2E.) In the end analysis, however, FFG is "solely liable for the payments of all Claim amounts." (Id. § 6(3).)

The third and final document is a "Certificate of Facultative Casualty Reinsurance" ("Reinsurance Agreement") that Federal entered into with FFG. Under the terms of the Reinsurance Agreement, Federal became (in addition to the claims administrator under the Administration Agreement) one of the reinsurers of coverage under the Policy, obligated to provide a quota share of 30% of the $100 million reinsurance limit of liability.[4]

The events that put these documents in play began in July 2002 when RSI announced that it would cease its broker-dealer operations and begin winding down. Eleven months later, several RSI executives served on Fleet a written demand, enclosing a draft civil complaint seeking damages, indemnity, and penalties arising from RSI and Fleet's alleged breach of their employment agreements, and a draft demand for arbitration of their claims. Shortly thereafter, Fleet filed a claim with FFG, requesting defense and indemnification for itself and RSI. Fleet also forwarded to FFG a copy of the demand letter, draft civil complaint, and draft arbitration demand.

---

[4] Captives typically buy reinsurance as a risk-spreading mechanism. See In re Petition of the Bd. of Dirs. of Hopewell Int'l Ins., Ltd., 272 B.R. 396, 400 & n.1 (Bankr. S.D.N.Y. 2002). Here, FFG purchased reinsurance from (or, in proper parlance, ceded it to) Federal on the Policy. Under this particular type of reinsurance (known as quota-share reinsurance), Federal agreed to cover 30% of FFG's losses under the Policy in exchange for the same percentage of Fleet's premium.

When neither Federal nor FFG responded to their claim, Plaintiffs began to negotiate a settlement with the aggrieved RSI executives in September 2003. Negotiations continued into December 2003, when Federal, mistakenly relying on a scrivener's error in the Policy, informed Fleet orally that its claims were not covered. Soon thereafter, Plaintiffs reached a settlement within the aggregate limit of the Policy, telling FFG on January 9, 2004. Federal finally responded in writing to Fleet's claim on February 24, 2004, acknowledging apologetically that the executives' claims were covered and asserting that it would further investigate the claims and possible defenses. However, because FFG did not reimburse Plaintiffs for defense costs or the settlement payment, Plaintiffs filed this action. Federal then moved to dismiss, pursuant to Rule 12(b)(6).

II. STANDARD OF REVIEW

If the allegations in the complaint, under any theory, are sufficient to state a cause of action, this Court must deny the motion to dismiss. Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994). Nevertheless, "minimal requirements are not tantamount to nonexistent requirements. The threshold may be low, but it is real." Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988). In order to survive dismissal, a plaintiff is "required to set forth factual allegations, either direct or

inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Id. at 515.

III. CHOICE OF LAW

Before the viability of Plaintiffs' claims may be addressed, the Court must first resolve the parties' choice-of-law dispute. Federal makes a pitch for the application of California law, arguing that "the alleged 'injury' to RSI and/or Fleet resulting from Federal's alleged conduct occurred either in California, where RSI is located, or Rhode Island, where Fleet is located." More to the point, Federal claims that the application of California law is dispositive because California courts do not recognize Plaintiff's causes of action. Rhode Island courts have not addressed these questions, so Federal wishes, quite understandably, to avoid its uncertain waters. However, because Federal believes that the ultimate resolution of the case would be identical under the law of either state, Federal contends that the Court need not determine which law applies. See Fratus v. Republic W. Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998) ("A federal court sitting in diversity need not make a finding regarding which state's law is to be applied where the case's resolution would be identical under either state's law."). Without commenting on Federal's interpretation of California law, Plaintiffs argue that Rhode Island law clearly applies.

As a preliminary matter, Federal's suggestion that this Court should bypass the choice-of-law question must be rejected. The principle that a court may eschew a choice of law is grounded in the pragmatic notion that federal courts, sitting in diversity, should do no more than is necessary to decide a case. See, e.g., Pediatricians, Inc. v. Provident Life & Accident Ins. Co., 965 F.2d 1164, 1168 (1st Cir. 1992). The prototypical example in this context is when there is no material conflict between the definitive law of the competing forums in terms of resolving the claims at issue, see Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989); but the principle is equally applicable to situations in which the highest courts of the competing forums, though both silent on the issue, likely would reach the same result. See Hart Eng'g Co. v. FMC Corp., 593 F. Supp. 1471, 1477 n.5, 1481 (D.R.I. 1984) (refusing to choose the applicable law because all three competing states had not addressed the question). The present situation is distinct because this Court would have to predict the course of Rhode Island law and then compare it to existing California law as a precursor to deciding the choice-of-law question. Such an exercise makes little practical sense, and would generate decision-making rather than reduce it.

To determine what law governs Plaintiffs' tort claims, this Court employs Rhode Island's choice-of-law principles. See Fashion House, 892 F.2d at 1092 ("In a tort case invoking diversity

jurisdiction, a federal district court must apply the forum's choice-of-law principles."). In tort actions that implicate the interests of multiple states, Rhode Island has adopted an interest-weighing test to ascertain which state "bears the most significant relationship to the event and the parties." Oyola v. Burgos, 864 A.2d 624, 627 (R.I. 2005) (quoting Taylor v. Mass. Flora Realty, Inc., 840 A.2d 1126, 1128 (R.I. 2004) (per curiam)). Such factors to be considered include "(a) [the] location where the conduct leading to the injury occurred, (b) the parties' domicile, residence or place of business; and (c) the location where the parties' relationship was centered," but by far "the most important factor is the location where the injury occurred." Taylor, 840 A.2d at 1128.

An examination of these factors compels the Court to apply Rhode Island law. The insured, Fleet, was incorporated in Rhode Island, which was at all relevant times its principal place of business and corporate home; RSI was incorporated in Massachusetts, and its principal place of business (at least at one time) was in California,[5] but all the communications surrounding the insurance

[5] RSI's principal place of business is not entirely clear. Paragraph 3 of the complaint names San Francisco, but Plaintiffs' opposition memorandum notes that RSI had ceased doing business in California by the time of the underlying employment dispute and, more importantly, the subsequent insurance claim spawning from that dispute. Federal takes issue with the absence of such an allegation in the complaint. To the extent that a factual dispute over RSI's principal place of business exists in the first place, it does not preclude a choice of law at this stage because the

claim – the subject of the present dispute – occurred in Fleet's Rhode Island office. Without question, Rhode Island has a substantial interest in protecting its resident insureds from injuries that occur within its borders. Because this interest outweighs any that California can bring to bear, the Court finds that the law of Rhode Island should apply.

IV. DISCUSSION

A. Bad Faith Claims Handling

Federal directs its first salvo against Plaintiffs' allegation that Federal violated its duty of good faith to review, analyze, and act on any and all claims by delaying its response and refusing to defend. Federal argues that R.I. Gen. Laws § 9-1-33(a), the authority Plaintiffs invoke in the complaint, only authorizes claims against the insurer that actually issued the policy in question, in this case, FFG. Plaintiffs respond by pointing out that the Unfair Claims Settlement Practices Act, R.I. Gen. Laws § 27-9.1-2(3), includes administrators in its definition of insurers. Nevertheless, Plaintiffs argue in the alternative that they may still proceed against Federal under the common law tort of bad faith.

A plain reading of § 9-1-33(a), entitled "Insurer's bad faith refusal to pay a claim made under any insurance policy," reveals

alleged "injury" occurred in Rhode Island – the most important factor in Rhode Island's interest-weighing approach.

that this statutory cause of action is restricted to insurers that actually issue the policies to insureds. The statute in pertinent part provides:

> Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance.

§ 9-1-33(a) (emphasis added). Although the Rhode Island Supreme Court has not addressed this question directly, it has balked at attempts to broaden § 9-1-33(a)'s cause of action beyond what the statute explicitly provides. See, e.g., Richard v. Blue Cross & Blue Shield, 604 A.2d 1260, 1262 (R.I. 1992) (holding that health-care provider was not an insurer within the meaning of § 9-1-33); LeFranc v. Amica Mut. Ins. Co., 594 A.2d 382, 385 (R.I. 1991) (holding that the language of § 9-1-33 applies only to insurers and not to the insurer's employees); see also Cianci v. Nationwide Ins. Co., 659 A.2d 662, 666 (R.I. 1995) ("We believe that the Legislature, in explicitly restricting the right to sue for a bad-faith refusal to pay a claim to an 'insured,' intended § 9-1-33 to apply only to those claimants who meet 'the technical insurance-contract meaning' of the term.").

It is true that § 27-9.1-2(3) defines "insurer" as, among other things, "adjusters and third party administrators," at least as the term is used in Rhode Island's Unfair Claims Settlement

Practices Act. See also R.I. Gen. Laws § 27-29-2(4) (similarly defining "insurer" within the strictures of unfair competition); R.I. Gen. Laws § 27-61-2(6) (same, but under Rhode Island's Unfair Discrimination Against Subjects of Abuse in Life Insurance Act). This seems odd in light of § 9-1-33(a)'s language because third-party administrators, by definition, do not issue primary insurance policies (at least to the insured under the policy they are administrating). Insofar as § 27-9.1-2(3) conflicts with § 9-1-33(a), however, it is not for this Court, sitting in diversity, to rectify that conflict. Rather, this Court is bound to Rhode Island's long-applied "canon of statutory interpretation which gives effect to all of a statute's provisions, with no sentence, clause or word construed as unmeaning or surplusage." Ruggiero v. City of Providence, 893 A.2d 235, 237-38 (R.I. 2006) (quoting Local 400, Int'l Fed'n of Technical & Prof'l Eng'rs v. Rhode Island State Labor Relations Bd., 747 A.2d 1002, 1005 (R.I. 2000)). With that canon in mind, this Court cannot endorse a construction of § 9-1-33(a) that would render meaningless, as Plaintiffs would have it, the phrase "issuing the policy." Because Federal did not issue the Policy, Plaintiffs cannot bring a cause of action against Federal under § 9-1-33(a).

Notwithstanding this conclusion, Plaintiffs argue that they can proceed against Federal at common law; specifically, on a claim for bad faith enunciated in Bibeault v. Hanover Ins. Co., 417 A.2d

313, 319 (R.I. 1980). (In Bibeault, the Rhode Island Supreme Court, joining a growing number of jurisdictions, recognized an independent cause of action in tort for an insurer's bad faith refusal to deliver payments.) Federal criticizes this theory in two ways. First, Federal observes that the Rhode Island General Assembly codified in § 9-1-33(a) the very common law tort Plaintiffs alternatively advance. According to Federal, by codifying § 9-1-33(a), the General Assembly sought to supercede Bibeault and eviscerate any common law cause of action for insurer bad faith. Second, to the extent that the common law tort cause of action remains viable, Federal argues that Plaintiffs pled only the statutory version by specifically identifying § 9-1-33(a) in Count IV of the complaint.

Federal touts Borden v. The Paul Revere Life Ins. Co, 935 F.2d 370 (1st Cir. 1991), to support its first argument. In Borden, the First Circuit considered an argument that a jury's decision should be overturned because the verdict sheet, while inquiring whether statutory bad faith had occurred, failed to provide a corresponding niche for common law bad faith. Rejecting the argument on a variety of grounds, the First Circuit noted that "we think it is clear that Rhode Island's enactment of a statutory cause of action for insurer bad faith codified, and thus supplanted, the common law action." Id. at 378. In the usual course of these matters, this Court would be bound by the holding of Borden; and, moreover, were

this Court deciding the question in the first instance, it would hold the same way. But the waters have been muddied somewhat by several recent holdings of the Rhode Island Supreme Court. Since Borden, the Rhode Island Supreme Court, invoking Bibeault, has reviewed claims of common law bad faith, if only to reject them on the merits. See, e.g., Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1261 (R.I. 2003) ("To succeed on a common law bad-faith claim in Rhode Island, a plaintiff must demonstrate the absence of a reasonable basis for denying the policy benefits and that defendant had knowledge or recklessly disregarded the lack of a reasonable basis for denying the claim."). Cf. Morris v. Highmark Life Ins. Co., 255 F. Supp. 2d 16, 25 (D.R.I. 2003) (analyzing § 9-1-33 against its broader common law backdrop). Admittedly, the relationship between statutory and common law bad faith is not well defined, but at the very least these subsequent cases connote the latter's continued vitality.

Federal's second argument is more quickly dispatched. Although Plaintiffs cite only § 9-1-33(a) in Count IV of the complaint, and make no express reference to its common law counterpart, the allegations themselves tell a story of bad faith that cannot be ignored in light of the liberal (and practical) construction that the Federal Rules of Civil Procedure demand. And as a practical matter, even if this count were dismissed, Plaintiffs would simply refile with a new caption, putting the case

right back where it started. See Fed. R. Civ. P. 8(f) (district courts are to construe pleadings so "as to do substantial justice"); Dopp v. HTP, Corp., 947 F.2d 506, 513 (1st Cir. 1991) ("Pleadings are liberally to be construed, and for the purposes of determining what relief a claimant has sought, complaints ought not to be read grudgingly or with a hypertechnical eye."); Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 226-27 (1st Cir. 1990) ("It is not fatal to a complaint that a legal theory has been mischaracterized or that the precise language invoking jurisdiction has not been used."); Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 622 (1st Cir. 1988) (holding that the failure to plead a particular legal theory, when the plaintiff pled two related legal theories, was not a bar to recovery); Janke Constr. Co., Inc. v. Vulcan Materials Co., 527 F.2d 772, 776 (7th Cir. 1976) (holding that the plaintiff's misconceived legal theory did not preclude it from obtaining relief under another theory).

The question then becomes whether Plaintiffs nevertheless can succeed on their common law claim. Bibeault yields little in the way of guidance as the opinion does not comment one way or the other on the potential liability of an insurer's independent administrator. On this score, Federal makes far too much of the Bibeault Court's citation to Gruenberg v. Aetna Ins. Co., 510 P.2d 1032 (Cal. 1973). In Gruenberg, the California Supreme Court held that, while an insured could allege a bad faith claim against its

insurer, it could not do so against that insurer's adjusting firm because it was not a party to the agreements for insurance. 510 P.2d at 1038-39. The purpose behind the citation to Gruenberg was nothing more than to show that the California Supreme Court had endorsed the reasoning of an earlier California Court of Appeals opinion, Fletcher v. W. Nat'l Life Ins. Co., 89 Cal. Rptr. 78 (Cal. Ct. App. 1970), upon which the Bibeault Court relied in expanding the duty of good faith beyond its traditional boundaries. See Bibeault, 417 A.2d at 318 ("In the subsequent decision of [Gruenberg], the California Supreme Court followed the reasoning of Fletcher in concluding that an independent cause of action in tort exists against insurance companies for breach of their implied-in-law duty of good faith and fair dealing."). It was not an endorsement of the holding of Gruenberg on the issue here.

Federal's more intriguing argument is that, because the common law tort of bad faith is based upon an insured's contractual relationship with its insurer, "there can be no cause of action for an insurer's badfaith refusal to pay a claim until the insured first establishes that the insurer breached its duty under the contract of insurance." Bartlett v. John Hancock Mut. Life Ins. Co., 538 A.2d 997, 1000 (R.I. 1988), abrogated on other grounds, Skaling v. Aetna Ins. Co., 799 A.2d 997, 1003-04 (R.I. 2002); see also Zarrella, 824 A.2d at 1261 ("Under Rhode Island law, however, a plaintiff first must show that he or she is entitled to recover

on the contract before he or she can prove that the insurer dealt with him or her in bad faith."); Lewis v. Nationwide Mut. Ins. Co., 742 A.2d 1207, 1209 (R.I. 2000) ("Before a bad-faith claim can even be considered, a plaintiff must prove that the insurer breached its obligation under the insurance contract."). Plaintiffs argue that these cases do not foreclose claims of bad faith against independent administrators; they simply stand for the proposition that an insured must first establish that it is entitled to recover under the insurance contract before it can prove bad faith on the part of the insurer or its administrator.

Several analogous cases outside of this jurisdiction indicate that this is the better reasoned approach.

In Wolf v. Prudential Ins. Co. of Am. 50 F.3d 793, 797-98 (10th Cir. 1995), the Tenth Circuit held that the "special relationship" between the claims administrator for a self-funded medical benefits plan and the insured gave rise to a duty of good faith. There, the administrator performed many of the tasks of an insurance company (though the insurer retained the ultimate responsibility for benefit determinations), had a compensation package that was contingent on the approval or denial of claims, and bore some of the financial risk or loss for the claims. The risk-sharing and cost arrangement was quite telling, as the panel explained:

> As payment for administering the plans, Prudential [the administrator] received a percentage of the premiums paid

> to the Annuity Board for participant coverage. As losses decreased, Prudential's share of the premiums increased. Additionally, under the stop-loss provision of its agreements with the Board, when losses reached a certain level, Prudential shared the risk with the Board; when losses got even higher, Prudential underwrote the entire risk.

Id. at 798. On these facts, the Tenth Circuit opined that the administrator was hardly the "stranger" to the insurance contract that it purported to be. Instead, the Tenth Circuit predicted (correctly) that the Oklahoma Supreme Court would, under similar circumstances, agree. See Wathor v. Mut. Assurance Adm'rs, Inc., 87 P.3d 559, 562-63 (Okla. 2004) (agreeing with the Tenth Circuit's analysis in Wolf, but holding that the administrator in that case did not owe a duty of good faith to the insured because of a flat fee arrangement and no shared risk of loss); see also Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1101-03 (Okla. 2005) (applying Wathor to reject an argument that an insurer's affiliate that handled and adjusted claims did not owe a duty to the insured to act in good faith).[6]

---

[6] Other courts have reached the same result under principles of joint venture. See Albert H. Wohlers & Co. v. Bartgis, 969 P.2d 949, 959 (Nev. 1998) (holding that an administrator that billed and collected premiums, paid and adjudicated claims, and shared in the insurer's profits was involved in a joint venture with the insurer and therefore susceptible to claims of bad faith); Farr v. Transamerica Occidental Life Ins. Co., 699 P.2d 376, 386 (Ariz. Ct. App. 1984) (holding that an administrator was involved in a joint venture with the insurer and thereby exposed to bad faith liability based on evidence that the administrator collected premiums, handled claims, and took a commission on the premiums collected and a percentage of the renewal commissions).

More recently, in Cary v. United of Omaha Life Ins. Co., 68 P.3d 462, 468-69 (Colo. 2003), the Colorado Supreme Court held that the administrators of a municipal medical and disability trust fund (through which municipal employees could obtain health insurance) were liable to insured municipal employees for bad faith claims handling. Relying on the Tenth Circuit's rationale in Wolf, the court reasoned that the administrators performed virtually all of the functions normally performed by an insurance company in processing claims. Cary, 68 P.3d at 468. The trust fund's only involvement, the court noted, was to bankroll the claims account and to hear final appeals when the administrators denied benefits. Significantly, the court remarked that an administrator's reinsurance contract with the municipality (obliging that administrator to reimburse the municipality for payments above $75,000 but below $1 million) gave that administrator "a powerful financial incentive to deny or limit claims." Id.

The circumstances at bar present an even stronger case for requiring an administrator in Federal's position to handle claims in good faith. FFG, a captive, entered into the Administration Agreement with Federal, to whom it delegated the primary control of the claims-handling process. This included the authority "to receive, review and evaluate any Claims" brought under the Policy, (Administration Agreement § 2(A)), and "to interpret [Policy] language, make [Policy] coverage decisions, and to settle covered

Claims for any amount up to the [Policy] limits." (Id. § 2(C).) In a sense, FFG "controlled" Federal's authority by requiring express written authority before Federal could deny, negotiate, adjust, or settle a claim, (id. § 2(A)), but the "ultimate disposition" of claims was nevertheless Federal's call to make. (Id. § 2(E)); see Dellaira v. Farmers Ins. Exch., 102 P.3d 111, 114-16 (N.M. Ct. App. 2004) (holding that an administrator that has control over and makes the ultimate determination regarding the merits of an insured's claim must act in good faith in processing the insured's claims). FFG simply was responsible for maintaining adequate reserves for the payment of claims, (see Administration Agreement § 5), and then paying claim amounts when they became due. (Id. § 6(3).) At the same time, Federal was bound, under its Reinsurance Agreement with FFG, to provide a quota share of 30% of the $100 million reinsurance limit of liability. By this arrangement, Federal had a financial incentive to deny or limit claims because Federal would be obligated to pay out of its own pocket a portion of the claim amount. See Cary, 68 P.3d at 468. These contractual responsibilities converge to give Federal "the power, motive, and opportunity to act unscrupulously." Wolf, 50 F.3d at 798.

It goes without saying that this case differs from those cases, relied upon by Federal, that involve insurance adjusters with little to moderate control over the claims-handling process and no financial incentive to deny or limit claims. See, e.g.,

Gruenberg, 510 P.2d at 1038-39; Carolina Bank & Trust Co. v. St. Paul Fire & Marine Co., 310 S.E.2d 163, 165-66 (S.C. Ct. App. 1983). However, under the compelling circumstances presented here, this writer believes it is fair to predict that the Rhode Island Supreme Court would require that Federal comply with the Policy's implied obligations of good faith and fair dealing. Importantly, exposing administrators in Federal's position to such liability would further a critical objective in Bibeault: to provide a disincentive for insurers who may wish to deny or limit claims underhandedly. See Bibeault, 417 A.2d at 318 n.5 (citing Richard G. Langdon & Curtis L. Sytsma, The Duty of Good Faith and Fair Dealing and the Pre-Adjudicatory Rule of the Insurance Company Advocate, 45 Ins. Counsel J. 309, 313 (1978) (writing, "the old objective of the claims man 'to find a loophole' is at an end")); see also 1 Stempel on Insurance Contracts § 10.02[A] at 10-17 (3d ed. 2006) ("The key determinant is whether the third-party administrator is both acting like an insurer and subject to the danger that it will, like an insurer acting in bad faith, place its own economic interest ahead of the interests of the policyholder."). There is no reasoned explanation for why this disincentive should not apply with equal force to an administrator in Federal's position who so visibly wears an insurer's hat.

B. Tortious Interference with Contractual Relations

Federal next attacks, on the basis of "legal impossibility," the allegation that it intentionally and wrongfully interfered with the insurance contract between Fleet and FFG. Federal explains that, when an agent acts within the scope of its authority, the agent and its principal are considered the "same entity." Cf. DeBrecini v. Graf Bros. Leasing, Ins., 828 F.2d 877, 879 (1st Cir. 1987) (holding that the acts of a corporate officer done in his or her official capacity are acts of the corporation). Because it is well-settled that a party cannot tortiously interfere with its own contract, see URI Cogeneration Partners, L.P., v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1288-89 (D.R.I. 1996) (construing Rhode Island law), Federal argues that it could not have induced FFG to breach its obligations under the Policy as a matter of law.

However correct in the abstract, Federal's argument fails because Plaintiffs have not conceded that Federal acted within the scope of its authority in handling (or mishandling) their claims; in fact, Plaintiffs allege the opposite. Federal harps on ¶ 25 of the complaint, which alleges the following: "[a]t all relevant times [Federal] acted as the agent of FFG in handling and otherwise administering the claims brought by Fleet under the Insurance Policy." Read in the light most favorable to Plaintiffs, however, this alleges nothing more than Federal's status as an agent of FFG. The preceding allegation in ¶ 24, repeated and realleged under

Count V in ¶ 83, supports this construction. After briefly discussing Federal's obligations under the Reinsurance Agreement, ¶ 24 alleges that "[Federal] breached its duties under the Claims Administration Agreement because it was acting in its interests as a reinsurer, attempting to avoid coverage, rather than as a neutral, objective claims handler." Moreover, in ¶ 84, Plaintiffs allege that Federal "put its own interest ahead of those" of FFG, and, in ¶¶ 85-87, that Federal failed adequately to inform FFG of the status of Plaintiffs' claim.

These allegations are sufficient to undercut Federal's premise. In a somewhat different context, the Rhode Island Supreme Court appears to have adopted this view. In Jolicoeur Furniture Co., Inc. v. Baldelli, 653 A.2d 740, 752-53 (R.I. 1995), the court held that a mayor could tortiously interfere with a contract to which the municipality was a party. The court began by recognizing that the tort is reserved for those who "intentionally and improperly interfere[] with the plaintiff's rights under a contract with another person." Id. at 752 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129 at 978 (5th ed. 1984)) (emphasis in original). The Justices went on to remark as a basis for their holding that "it is not inconceivable that the separate branches would be independent enough to act in opposition to one another in any number of ways." Id. (citing Goldwater v. Carter, 444 U.S. 996, 997-98 (1979)). As an illustration, the court noted

that "numerous cases in the private sector have addressed the ability of an agent to interfere with the contract of the principal." Id. at 753 (citing Thomas G. Fischer, Annotation, Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another, 72 A.L.R. 4th 492 (1989)); see also Roy v. Woonsocket Inst. for Savings, 525 A.2d 915 (R.I. 1987) (considering a claim by a terminated employee that his immediate supervisor had tortiously interfered with the employee's employment contract).

Jolicoeur contemplates that an insurance administrator could, under appropriate circumstances, illicitly interfere with the contract of its principal. Like any other agent, an administrator could accomplish this feat by acting beyond the scope of its authority. See Kennett v. Marquis, 798 A.2d 416, 419 (R.I. 2002) (per curiam) ("An agent, however, may be personally liable for unauthorized acts outside the scope of the agency[.]"); Brown v. State Farm Fire & Gas Co., 58 P.3d 217, 223 (Okla. Civ. App. 2002) (remarking that an independent insurance adjuster could be liable for tortiously interfering with an insurance contract by acting beyond the scope of its authority from the insurer); see also Michelson v. Exxon Research & Eng'g Co., 808 F.2d 1005, 1007-08 (3d Cir. 1987) (holding that a corporate officer, acting in his or her official capacity, could not tortiously interfere with a corporate contract because corporations act only through their officers and

agents); Rao v. Rao, 718 F.2d 219, 225 (7th Cir. 1983) (similar); Am. Trade Partners, L.P. v. A-1 Int'l Importing Enter., LTD., 757 F. Supp. 545, 555-56 (E.D. Pa. 1991) (same); Shoemaker v. Myers, 801 P.2d 1054, 1068 (Cal. 1990) (same); Hickman v. Winston County Hosp. Bd., 508 So.2d 237, 239 (Ala. 1987) (same). Whether Federal's interests as a reinsurer influenced its handling of Plaintiffs' claim, and thus induced FFG wrongfully to breach the terms of coverage under the Policy, remains to be seen. However, the allegation alone is enough at this stage to frustrate Federal's argument, and survive this motion.

C. Negligence

As its final argument, Federal contends that independent administrators do not owe insureds a duty of reasonable care, and therefore cannot be sued in negligence. Federal chiefly relies on Cardente v. Maggiacomo Ins. Agency, Inc., 272 A.2d 155, 156 (R.I. 1971), to support its contention that the Rhode Island Supreme Court would not hold Federal to such a sweeping duty. Plaintiffs argue that another case, Forte Bros. Inc. v. Nat'l Amusements, Inc., 525 A.2d 1301 (R.I. 1987), supports their negligence claim against Federal, and is a better indicator of what Rhode Island's highest court would do.

A quintessential element of Rhode Island tort law is that "[a] defendant cannot be liable under a negligence theory unless the defendant owes a duty to the plaintiff." Benaski v. Weinberg, 899

A.2d 499, 502 (R.I. 2006) (quoting Lucier v. Impact Recreation, Ltd., 864 A.2d 635, 638 (R.I. 2005) (per curiam)). Whether a duty of care exists in a particular case is a question of law. Martin v. Marciano, 871 A.2d 911, 915 (R.I. 2005). "If no such duty exists, then plaintiff's claim must fail, as a matter of law." Selwyn v. Ward, 879 A.2d 882, 886 (R.I. 2005).

Federal's reliance on Cardente (at least at this juncture) is misplaced for reasons previously discussed. The insureds in Cardente operated lumberyards at various locations in Rhode Island and, for several years, had procured coverage through insurance agents, who delivered the policies and received the premiums on behalf of the carriers. 272 A.2d at 156. While the policies were in effect, the insureds transferred part of their operations, including certain insured "contents," to another municipality.[7] To retain the same coverage in their new location, the insureds requested that the agents issue change-of-location endorsements. The agents agreed but for some reason neglected to issue the endorsements and failed to advise the carriers of the insureds' location change. Within a short time, the contents were damaged substantially at the new location, and the insured sued the agents on a negligence theory. In a narrow holding, the court refused to hold the agents to a duty of reasonable care because "an agent

[7] The opinion does not specify whether the transferred and subsequently damaged "contents" were lumber or some other material.

acting on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of his authority." Id. The Cardente Court could do this, the Justices went on to explain, because, by virtue of a stipulation at trial, there was no question but that the insurance agents had acted within the scope of their authority. See id. at 156-57. There is no such concession here; as noted above, the complaint in the present case alleges that Federal acted outside the scope of its authority in handling Plaintiffs' claim. This stifles Cardente's significance, at least for the purposes of the disposition of the present motion.

Forte Bros. requires more discussion. There, defendant National Amusements, Inc. ("National") hired plaintiff Forte Bros., Inc. ("Forte") to perform excavation and grading work for the construction of a movie theater. 525 A.2d at 1302. National separately retained the services of Allen & Demurjian ("Allen"), an architectural/engineering firm, to supervise the project; specifically, it was Allen's duty to measure the removal of mass rock and boulders, to report the removal to National, and to approve payments to Forte for the excavation. Forte sued Allen for negligence when an employee of Allen allegedly failed properly to measure the amount of rock Forte removed. Allen responded that it had acted as National's agent at all times, had no contract with Forte (only National), and thus was not personally liable to Forte

as a matter of law. The court, highlighting the unique relationship between contractors and architects, found that architect Allen owed Forte a duty to render its services professionally, notwithstanding (1) Allen's agency relationship with National, and (2) the absence of privity between Allen and Forte. Id. at 1303. Importantly, the court observed that "contractors . . . share an economic relationship and community of interest with the architect on a construction project," id., and that "too much control over the contractor necessarily rests in the hands of the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor." Id. (quoting United States v. Rogers & Rogers, 161 F. Supp. 132, 136 (S.D. Cal. 1958)).

By recognizing an independent duty in tort, Forte Bros. represents an exception to the general rule propounded in Cardente. Kennett, 798 A.2d at 418. The exception carries currency in the construction context, see Boren v. Thompson & Assoc., 999 P.2d 438, 445 (Okla. 2000) (holding, relying in part on Forte Bros., that an architectural firm had duty to ensure that general contractor had secured statutorily required payment bond before certifying payments to contractor), and has superficial appeal here, particularly with respect to the power Allen possessed over Forte's paycheck. The negligent exercise of Allen's responsibilities (i.e., his faulty measurement of the amount of rock Forte removed)

translated directly into an economic loss for Forte. It was Forte's "direct and reasonable reliance" on the performance of Allen's contractual duties — a function of the "economic relationship and community of interest" between contractor and architect on a construction project — that moved the court to find an independent duty of care. Forte Bros., 525 A.2d at 1303. In the present case, for example, Fleet relied on Federal to administer its claims and determine the scope of coverage. Federal's negligent administration could result (or, as Plaintiffs allege, did result) in the denial of an estimable claim, thereby depriving Fleet of coverage otherwise owed under the Policy. This would seem to offer some support for the conclusion that Federal should handle Plaintiffs' claims with reasonable care.

But Rhode Island courts have been reluctant to extend Forte Bros. beyond the chainlink fences of a construction site.[8] See, e.g., Kennett, 798 A.2d at 419 (holding that a real estate agent does not owe a buyer a duty independent of the agency relationship with the seller); Boston Inv. Prop. No. 1 State v. E.W. Burman, Inc., 658 A.2d 515, 516-518 (R.I. 1995) (distinguishing Forte Bros. from a dispute between a seller and a buyer over the negligent construction of a commercial office building); Triton Realty Ltd.

---

[8] Interestingly, this reluctance appears to extend even within the construction context. See Lutz Eng'g Co., Inc. v. Indus. Louvers, Inc., 585 A.2d 631, 636 (R.I. 1991) (distinguishing Forte Bros. from a dispute between a subcontractor and an architect whose only responsibility was to review shop drawings).

P'ship v. Almeida, No. C.A. PC 04-2335, 2006 WL 828733 at *3-*4 (R.I. Super. Mar. 29, 2006) (distinguishing Forte Bros. from a dispute between the owner of the Station nightclub and the insurance broker it alleged acted negligently in procuring a liability insurance policy). This makes sense, upon closer examination, because Forte Bros.'s holding itself was the product of a national trend "intended to abrogate the protection [i.e., the privity requirement] afforded to architects, engineers, and contractors in certain suits brought by third parties." Anderson v. Garafalo & Assocs., Inc., No. C.A. PC 1991-8501, 2003 WL 23195552 at *3 (R.I. Super Nov. 14, 2003); see Forte Bros., 525 A.2d at 1303 (citing Donnelly Constr. Co. v. Oberg/Hunt/Gilleland, 677 P.2d 1292, 1295 (Ariz. 1984); A.R. Moyer, Inc. v. Graham, 285 So.2d 397, 403 (Fla. 1973) (Dekle, J., concurring in part and dissenting in part); Davidson & Jones, Inc. v. County of New Hanover, 255 S.E.2d 580, 584 (N.C. Ct. App. 1979)); see also Rousseau v. K.N. Const., Inc., 727 A.2d 190, 192 (R.I. 1999) (discussing the abrogation of the privity requirement in this context); Walsh v. Gowing, 494 A.2d 543, 548 (R.I. 1985) (same); Temple Sinai-Suburban Reform Temple v. Richmond, 308 A.2d 508, 510 (R.I. 1973) (same). Viewed in this contextual light then, Forte Bros. is ultimately of little help in predicting how Rhode Island law would react if touched by the facts alleged in the present case.

Rhode Island's subsequent adoption of the economic-loss rule, which generally precludes the recovery of purely financial or economic losses in negligence, further distances the holding in Forte Bros. from this case. The court's opinion in Burman is instructive on this point. In Burman, an investment company purchased a recently-erected commercial office building through a written purchase-and-sales agreement with no express warranties concerning its condition. 658 A.2d at 515. When the investment company discovered certain defects in the building's construction, it sued both the seller (for breach of contract) and the general contractor the seller had hired to construct the building (for negligence). Plaintiff filed suit in the United States District Court for the District of Rhode Island, but the issue surrounding the contractor's liability was certified to the Rhode Island Supreme Court in the following form: "In the absence of privity of contract with the general contractor, is the subsequent purchaser of a commercial office building in Rhode Island entitled to recover economic damages which it is alleged were proximately caused by the negligence of the general contractor?" Id.

The Justices responded in the negative. The court began by recognizing that "the duty that sellers owe to subsequent purchasers is established primarily through contracts between the parties who theoretically reach an arms-length agreement on the sale price that reflects the true value of the land." Id. at 517

(quoting Hydro-Mfg., Inc. v. Kayser-Roth Corp., 640 A.2d 950, 955 (R.I. 1994)). Because a sophisticated buyer would inspect the property and inquire into possible defects, that buyer has the ability ex ante to negotiate a selling price that adequately accounts for such things or to obtain appropriate warranties. Hence, "when parties have [or could have] contracted to protect against potential economic liability . . . contract principles override . . . tort principles . . . and, thus, purely economic damages are not recoverable." Id. (quoting Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist., 881 P.2d 986, 993 (Wash. 1994)); see also Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660, 672 (N.J. 1985) ("Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement."). Were this not the case, the court warned, "certainty and predictability in allocating risk would decrease and impede future business activity." Id. (quoting Berschauer/Phillips, 881 P.2d at 993). The consequence of the court's response was that the plaintiff could proceed against the seller in contract, but not against the contractor in negligence.

Burman's logic carries over to the present case. To procure insurance coverage, Fleet, a sophisticated corporate entity, entered into a complicated insurance arrangement with its captive FFG, which it controlled. Fleet was in a position of strength to

define the scope of its coverage by negotiating for favorable (or at least acceptable) terms, to which both parties became bound in the Policy. Fleet could thus (and did) protect itself in contract from the financial consequences of certain events, such as the settlement costs associated with the underlying employment dispute in this case.[9] A dispute arising out of a claim for coverage (a purely economic loss) would then be governed by the Policy and its accompanying implied obligations of good faith and fair dealing. See Burman, 658 A.2d at 515-17. This restricts the causes of action Fleet may bring against FFG to breach of contract and bad faith, and precludes negligence.[10] See Skaling, 799 A.2d at 1006-07. In contrast, independent administrator's like Federal do not have the ability to limit their exposure by contract with the insured. Rather, Federal's obligations are measured by its Administration Agreement with the insurer, to whom Federal's acts

---

[9] This sets the present case apart from Rousseau, 727 A.2d at 192, which involved unsophisticated consumer-plaintiffs who could not adequately guard against economic losses through contract.

[10] It is unclear whether, under Rhode Island law, the economic-loss rule would extend to service providers, such as insurers and their agents. Some jurisdictions have held that it does not. See, e.g., Ins. Co. of N. Am. v. Cease Elec. Inc., 688 N.W.2d 462, 467, 472 (Wis. 2004) (holding that the rule does not apply to bar tort claims against service providers). But here the question is academic. It is not the economic-loss rule per se that prohibits Fleet from suing Federal in negligence, but the disparity that would result if an independent administrator owed a duty to an insured that the insurer did not. Discussion of the economic-loss rule simply highlights that disparity.

are attributed under general principles of agency. Under these circumstances, binding Federal to a duty of reasonable care viz-a-viz the insured would be illogical (to say the least) without, at a bare minimum, holding FFG -- the actual insurer -- to the same. (The oddity of this situation is evident in the instant complaint, which refrains from charging FFG with negligence.)

The majority of jurisdictions that have visited this question have concluded similarly, although these cases typically involve adjusters with a lesser degree of control over the claims-handling process than displayed in the case at bar. See, e.g., Hamill v. Pawtucket Mut. Ins. Co., 892 A.2d 226, 230 (Vt. 2005) ("We concur with the majority view that public policy considerations do not favor creating a separate duty on the part of independent adjusters that would subject them to common law tort actions by insureds who have suffered economic loss as the result of allegedly mishandled claims."); Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co., 586 S.E.2d 586, 588-89 (S.C. 2003) ("We decline to recognize a general duty of due care from an independent insurance adjuster or insurance adjusting company to the insured, and thereby align South Carolina with the majority rule on this issue."); Meineke v. GAB Bus. Servs., Inc., 991 P.2d 267, 270-71 (Ariz. Ct. App. 1999) (same); Sanchez v. Lindsey Morden Claims Servs., Inc., 84 Cal. Rptr. 2d 799, 803 (Cal. Ct. App. 1999) (same); King v. Nat'l Sec. Fire & Cas. Co., 656 So.2d 1338, 1340 (Fla. Dist. Ct.

App. 1995) (same). Only a sparse minority of courts have held otherwise. See, e.g., Morvay v. Hanover Ins. Cos., 506 A.2d 333, 335 (N.H. 1986) (holding that independent insurance investigators owe a duty of care to the insured as well as to the insurer to conduct a fair and reasonable investigation of an insurance claim because insured could be harmed financially if investigations were performed negligently); Brown, 58 P.3d at 223 (same); Cont'l Ins. Co. v. Bayless & Roberts, Inc., 608 P.2d 281, 287-88 (Alaska 1980) (similar); cf. Bass v. Cal. Life Ins. Co., 581 So.2d 1087, 1090 (Miss. 1991) (holding that a adjuster "can only incur independent liability when his conduct constitutes gross negligence, malice, or reckless disregard for the rights of the insured").

This writer is not entirely unsympathetic to Plaintiffs' call to augment in law the obligations of independent administrators like Federal, but Rhode Island precedents and the majority approach must stay the Court's hand.[11] The Rhode Island Supreme Court is perfectly capable of pioneering new frontiers in the law of negligence on its own, and is in a better position to do so. This Court remains mindful that, as a federal court sitting in diversity, its "function is not to formulate a tenet which [it], as

---

[11] Plaintiffs are not without redress, however, for they may proceed against Federal on their claims of bad faith and tortious interference, as previously discussed. Of course, these findings are not consolation prizes in light of the Court's holding with respect to negligence, but reminders that Federal's status as an independent administrator alone does not insulate it from all species of direct liability.

[a] free agent[], might think wise, but to ascertain, as best [it] can, the rule that the state's highest tribunal would likely follow." Kathios v. Gen. Motors Corp., 862 F.2d 944, 949 (1st Cir. 1988). Plaintiffs deliberately chose this forum instead of the state court. Having done so, they are "'in a perilously poor position to grumble' about [this Court's] stodginess." Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990); see also Kassel v. Gannett Co., Inc., 875 F.2d 935, 950 (1st Cir. 1989).

V. CONCLUSION

For all the foregoing reasons, Federal's Motion to Dismiss is GRANTED in part and DENIED in part. Count VI (negligence) is DISMISSED; Count IV (bad faith claims handling) and Count V (tortious interference with contractual relations) state claims upon which relief can be granted.

It is so ordered.

[signature]

William E. Smith
United States District Judge

Date: 2/14/07